O’Connor, C.J.,
concurring in part and dissenting in part.
{¶ 28} Although I agree with the majority that the Board of Tax Appeals (“BTA”) erred by reinstating the Franklin County auditor’s valuation of the 21 condominiums at issue in this case (at an aggregate value of $8,139,300 for tax year 2008), I do not agree that the case law compels us to order reinstatement of the decision of the county board of revision. I therefore concur in part and dissent in part.
Analysis
{¶ 29} Appellant, East Bank Condominiums II, L.L.C., at the hearing before the board of revision, presented the appraisal report and testimony of Thomas Horner. The board of revision adopted Horner’s appraisal’s aggregate valuation of $3,100,000, which reflected not only an adjustment for the unfinished state of the condominiums, but also a decrease to 48 percent of what Horner termed the “gross sale proceeds” (sometimes called the “gross sale price”) of the unfinished units. The BTA correctly found that although Horner’s “bulk discount” is an appropriate appraisal method for financial institutions that lend to condominium development projects, it does not apply to appraisals of real property for tax purposes under Ohio law. Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision, BTA Nos. 2009-Q-1282 through 2009-Q-1301 and 2009-Q-1408, 2012 WL 3166815, :;:5 (July 24, 2012) (“We believe East Bank’s reliance on * * * FIRREA guidance is misplaced; while it may be true that, for purposes of appraising properties for financing purposes, it is appropriate to apply a bulk discount, the present matter concerns appraisal for tax valuation purposes”).[2] *202 Moreover, the BTA has a duty to independently weigh evidence. That duty is critically important here because the deficiency in the Horner appraisal that the BTA identified is a legal flaw rather than a factual one, and therefore there was no necessity that the board of education present additional evidence to substantiate that flaw.
{¶ 30} I would affirm the BTA’s decision to the extent that it rejected the bulk-sale approach to valuing the condominiums and thus dissent from the majority’s acceptance of that method of valuation. However, I concur in the majority’s conclusion that the BTA should have determined a discount for the unfinished states of the condominiums on the tax-lien date. To remedy that defect, I would reverse the BTA’s reinstatement of the auditor’s valuation and remand this cause to the BTA for determination of a proper percentage discount as required by Ohio Adm.Code 5703-25-06(G).
The Homer appraisal’s bulk-discount approach runs afoul of the well-established economic-unit doctrine
{¶ 31} Because this case involves the valuation of 21 condominium units as of January 1, 2008, the analysis must begin with the recognition that each unit constitutes a separate parcel, in spite of the fact that they all are contained in a common building. The division into separate parcels for property-taxation purposes is a requirement imposed by law. “Each unit of a condominium property * * * is deemed a separate parcel for all purposes of taxation and assessment of real property.” R.C. 5311.11.
{¶ 32} In a county auditor’s capacity as assessor of the real estate tax, the auditor is charged with the duty to “view and appraise or cause to be viewed and appraised at its true value in money, each lot or parcel of real estate.” R.C. 5713.01(B). Read together, Article XII, Section 2 of the Ohio Constitution and R.C. 5713.03 require the auditor, when determining the true value of each parcel, to use either an actual arm’s-length sale price showing the value of the property or an appraisal determining what that sale price would be. Conalco, Inc. v. Monroe Cty. Bd. of Revision, 50 Ohio St.2d 129, 363 N.E.2d 722 (1977), paragraph one of the syllabus; State ex rel. Park Invest. Co. v. Bd. of Tax Appeals, 175 Ohio St. 410, 412,195 N.E.2d 908 (1964); see also Berea City School Disk Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision, 106 Ohio St.3d 269, 2005-Ohio-4979, 834 N.E.2d 782, ¶ 9-10. The Horner appraisal did not comply with this constitutional and statutory framework.
*203 {¶ 33} In the valuation section of the appraisal report, Horner stated that his appraisal aimed at determining “a bulk purchase value [that] represents what the owner would sell all of the units to a single purchaser [for].” The report proceeded to explain that “[t]he investor,” i.e., the bulk purchaser, would then be “entitled to the future profit from the individual sales, but would also incur the cost of holding and selling the units during the absorption period.” Given this premise for the appraisal, the BTA here justifiably relied on its earlier decision in M/I Homes of Cincinnati, L.L.C. v. Warren Cty. Bd. of Revision, BTA No. 2009-V-3796, 2010 WL 3724159 (Sept. 21, 2010), to characterize Horner’s approach as “an analysis [that] arrives at an investment value, rather than real market value,” of the condominiums as parcels of real property. 2012 WL 3166815 at *4. Simply stated, the Horner appraisal did not value the individual condominiums in terms of what they would ultimately have sold for in the market. Instead, the appraisal projected a bulk-sale price that a developer-buyer or an investor would have paid for all the units together. That bulk price would inevitably have been less than the ultimate sale price of the individual units, because a bulk purchaser would have paid only an amount that would have yielded a profit once the condominiums were sold individually. Thus, the actual sale prices were discounted to a current investment value, but our precedent is clear that it is the sale prices themselves that must be the properties’ values for tax purposes.
{¶ 34} This discounting process becomes graphically visible later in the valuation section of the appraisal report, which shows the allocation of the “as-is price” to each condominium on a per-square-foot basis and then shows the discount taken for each condominium to 48 percent of that price. In addressing a similar type of appraisal, the Oregon Supreme Court cogently stated that because a developer’s discount “reduces the market price of the properties by a rate of return based on expected profit, taking into account the expected time necessary to sell the lots,” it does not “assess the value of the properties if put to their highest and best use, but reduces their value to arrive at the value of the properties considered as an investment.” First Interstate Bank of Oregon, N.A. v. Dept. of Revenue, 306 Or. 450, 454-455, 760 P.2d 880 (1988).
{¶ 35} Additional evidence that the bulk-discount analysis does not indicate the tax value of the individual units is found in Horner’s reliance on the FIRREA exhibit introduced at the BTA hearing. That exhibit includes a statement that for a condominium building with five units or more, a financing institution “may not use the aggregate retail sales prices of the individual units as the market value to calculate the [loan-to-value] ratio.” That is the rule on which Horner’s bulk discount is based. It states in so many words that the bulk-discount valuation is not equivalent to the sale price of the condominiums. However, the sale price must be the proper measure of value for tax purposes.
*204 {¶ 36} Under certain circumstances, Ohio law may permit multiple parcels to be valued as a single economic unit. But those circumstances are not present here.
{¶ 37} For example, in Park Ridge Co. v. Franklin Cty. Bd. of Revision, 29 Ohio St.3d 12, 504 N.E.2d 1116 (1987), this court noted that an “economic unit” for tax-valuation purposes may in some situations comprise multiple parcels or a portion of a larger parcel, and stated the test for determining a property’s status as an economic unit: “For tax valuation purposes, property with a single owner, for which the highest and best use is a single unit, constitutes a tract, lot, or parcel.” (Emphasis added.) Id. at paragraph two of the syllabus. See also Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision, 77 Ohio St.3d 402, 404-406, 674 N.E.2d 696 (1997) (citing and applying the Park Ridge syllabus). A determination to value a property as an economic unit therefore depends, as a matter of law, on a finding that the highest and best use of the parcels at issue consists of continued use under common ownership. On this record, the BTA was justified in not making such a finding. Indeed, no evidence in the record would have supported it.
{¶ 38} Far from furnishing support for such a finding, Horner’s appraisal negates it. Several statements in the appraisal indicate that the ultimate sales of the condominiums were anticipated to be as individual units. Moreover, the section of Horner’s appraisal specifically discussing highest and best use states that “[biased on those uses that are legally permissible, physically possible and financially feasible, the maximally productive use of the site involves 28 total living units.” Although this part of the appraisal does not explicitly state that the “living units” will be individually owned, the statement certainly does not assert that the highest and best use constitutes continued common ownership. This case does not involve an apartment building, in which a single landlord owns the entire building and rents out individual units; this case involves condominiums. Taken in context, the “highest and best use” determination must be that the condominiums will ultimately be individually owned and are not an economic unit.
{¶ 39} In addition to Horner’s original appraisal, the majority refers to Horner’s analysis of actual subsequent sales that he later offered at the BTA hearing as though that analysis somehow corroborates the propriety of the bulk discount in the original appraisal. It does not.
{¶ 40} The majority fails to recognize that the subsequent-sale analysis merely repeats the very same flaw that the BTA identified in the original appraisal. Once again, Horner does not value the individual units according to the price at which they would sell (or the price at which they did, in fact, sell). Rather, Horner for a second time discounts from that “retail” sale price to determine what an investor would have paid in bulk on January 1, 2008, with a view to *205 making a profit. The bulk-sale price of $2,900,000 that Horner presented to the BTA turned out to be lower than the $3,100,000 projected in the original appraisal because the sale prices turned out to be lower than projected.
{¶ 41} On redirect examination during the BTA hearing, Horner confirmed this point. He was asked whether the revised $2,900,000 figure “reduced lower the net present value [i.e., the bulk-discount valuation of $3,100,000] you came up with in your original appraisal.” Horner answered: “Correct.” Moreover, Horner testified that the subsequent sales indicated “an average of $146 per square foot.” That number, projected over the 42,627 total square feet of the 21 units still to be sold as of January 1, 2008, would have amounted to gross sale proceeds for all 21 units of $6,223,542 (as opposed to the gross sale proceeds of $6,492,294 projected in the original appraisal). Horner’s revised “net present value” of $2,900,000 was about 47 percent of the gross sale proceeds of $6,223,542, just as the original appraisal’s net present value of $3,100,000 was about 48 percent of- $6,492,294. Thus, the flawed methodology did not change, even though subsequent sales were used.
{¶ 42} The BTA acted reasonably and lawfully in determining that the board of revision had erred by relying on the Horner appraisal’s bulk-discount approach. I must dissent from the majority’s conclusion to the contrary.
Because the BTA’s duty is to independently weigh the evidence, it may reverse a decision of a board of revision even if no new evidence is presented before the BTA
{¶ 43} I also disagree with the majority’s view that because the board of education presented no new evidence at the BTA hearing to controvert the Horner appraisal, the BTA was required to affirm the board of revision’s decision to adopt that appraisal. This reasoning cannot be reconciled with the BTA’s duty to perform a fully independent weighing of the evidence presented at all levels when determining the value of real property.
{¶ 44} Although the majority opinion cites Vandalia-Butler City Schools Bd. of Edn. v. Montgomery Cty. Bd. of Revision, 130 Ohio St.3d 291, 2011-Ohio-5078, 958 N.E.2d 131, the holding in that case does not support the majority’s analysis.
{¶ 45} In Vandalia-Butler, the property owner filed a complaint and presented evidence before the board of revision, just as in the present case. Id. at ¶ 3-4. The board of revision adopted a lower valuation based on the owner’s evidence, just as in the present case. Id. at ¶ 6. At the BTA hearing, the board of education argued that the owner’s evidence was insufficient, but it presented no new evidence, just as in the present case. Id. at ¶ 8-9.
{¶46} Although the BTA expressed reservations about the quality of the evidence the owner had presented to the board of revision, the BTA stated the *206 issue as whether there was sufficient evidence to support the board of revision’s determination. Id. at ¶ 9. The BTA ultimately adopted the board of revision’s valuation in spite of its explicit reservations. Id. at ¶ 10.
{¶ 47} On appeal, we unanimously found error as a matter of law, vacated the BTA’s decision, and remanded to the BTA for further proceedings. We stated that “the BTA’s crucial error in this case lay in its exclusive reliance on the BOR’s evaluation of the evidence rather than its own.” Id. at ¶ 14. We specifically faulted the BTA for exercising excessive deference to the board of revision’s decision. Id. at ¶ 19. On remand, we ordered the BTA to determine whether sufficient evidence permitted it to perform an independent valuation; if there was sufficient evidence, the BTA was to perform that valuation. If there was not, the BTA was to revert to the auditor’s determination. Id. at ¶ 26-28.
{¶ 48} Our discussion in Vandaliar-Butler of the independent role of the BTA should apply equally to the situation here. Although the unfinished state of the condominiums had to be taken into account when valuing them, the majority fails to recognize the validity of the BTA’s reasonable and lawful rejection of the Horner appraisal’s bulk-discount approach. The BTA’s duty to independently weigh evidence permitted it to reject that bulk-discount approach regardless of whether the school board presented further evidence before the BTA, and its decision should be affirmed to that extent. Our precedent is clear and should be followed here.
The BTA should have performed an independent determination of the discounted value of the condominiums because of their unfinished state
{¶ 49} Finally, I concur with the majority that the BTA erred by failing to ensure that the value assigned to the condominiums reflected a discount based on their unfinished state as of January 1, 2008, the tax-lien date. But instead of requiring reinstatement of the board of revision’s decision, which relied on the erroneous bulk-sale approach, this error calls for a remand to the BTA for a proper determination of the percentage discount required by Ohio Adm.Code 5703-25-06(0, which provides that “[i]f a building, structure, fixture or other improvement to land is under construction on January first of any year, its valuation shall be based upon its value or percentage of completion as it existed on January first.”
{¶ 50} The property-record cards in this case set forth percentage-of-completion figures, but do not evidence whether the auditor properly applied a discount. Additionally, the Horner appraisal took into account the percentage of completion. I would remand to the BTA with the instruction that the BTA perform an appropriate reduction to account for the unfinished state of the condominiums, basing its finding on the entire record or, if need be, on additional evidence *207 adduced pursuant to the BTA’s authority to “make * * * investigation concerning the appeal” under R.C. 5717.01.
Conclusion
{¶ 51} I concur in the majority’s conclusion that the auditor’s valuation was too high, but dissent from the remainder of the majority’s opinion and its order that the board of revision’s valuation must be reinstated.
Lanzinger and French, JJ., concur in the foregoing opinion.

. FIRREA is short for the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, an act of Congress that in the wake of the savings-and-loan scandal of the 1980s enacted measures *202 designed in part to improve the integrity of lending practices. Herbst v. Resolution Trust Corp., 66 Ohio St.3d 8, 9, 607 N.E.2d 440 (1993).